# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                                CIVIL ACTION NO.

_____
                                        )
THERESA SAIA,                           )
        Plaintiff,                      )
                                        )
v.                                      )
                                        )
BOSTON CHILDRENS HOSPITAL,              )
                                        )
        Defendant.                      )
_____)

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

The Plaintiff, Theresa Saia ("Ms. Saia" or "Plaintiff") seeks damages from Defendant

Boston Children's Hospital ("BCH") for violations of Mass. Gen. Laws chapter 151B as well as

the Age Discrimination in Employment Act of 1967. Ms. Saia's claims stem from Boston

Children's Hospital's age discrimination and subsequent acts of retaliation against Ms. Saia.

Ms. Saia has been an employee of the hospital for over 44 years. During that time Ms.

Saia has been an exemplary employee for the hospital, working in various roles as a registered

nurse, an Advanced Practice Registered Nurse (APRN) as a Certified Nurse Practitioner (NP)

along with formal operational leadership roles throughout the years, overseeing other NPs,

registered nurses, research, and administrative staff in the BCH Heart Center. Throughout her

career, she has worked collaboratively with the Heart Center and BCH Leadership Teams that

include Physician, Nurse, Administrative, and Multidisciplinary Leaders and staff as well as

Executive Leaders within the Heart Center and across the BCH Enterprise.

In November 2021, BCH created paired 0.5 FTE Advanced Practice Registered Nurse (APRN) and 0.5 Physician Assistant (PA) director positions to provide oversight of professional and administrative aspects related to these key advanced practice clinician (APC) roles. The APRN Director was to be guided operationally under the SVP, Executive Operations in alignment with the EVP, Patient Care Operations and System Chief Nursing Officer who provides oversight for all aspects of nursing professional practice throughout Boston Children's system of care. The APRN Director position had no direct NP reports. The PA Director position had no direct PA reports. NPs and PAs reported to Nurse Directors or Sr. Nurse Directors reported to Nurse Directors as they had historically.

In April 2023, BCH announced that additional APRN Director positions would be created so that all BCH NPs would report to a Director who was an NP. This was intended to improve NP recruitment, retention, and engagement. This was also exactly the role that Ms. Saia held in Outpatient Cardiology at this time. At the time of this announcement, Ms. Saia was the Director for 45 Ambulatory Cardiology NP's, 50% of the BCH Heart Center NP's, and she was one of three practicing NPs in Nurse Director positions, leading and managing NPs as direct reports. Ms. Saia had managed the Cardiology NP team since December of 2015, first as a Nurse Manager and then as Nurse Director upon promotion. Her job title was Nurse Director as there was not a job code that differentiated NPs who were Nurse Directors from non-NPs who were Nurse Directors. Ms. Saia's statistics regarding NP recruitment, retention, engagement, and satisfaction in Cardiology were excellent, as were her budget management skills, with no overtime expense noted for over eight years. Accordingly, Ms. Saia requested conversion to the

APRN Director job code as it would finally recognize her combined role of NP Director, clinically active practicing NP, and her ongoing formal NP leadership roles within the HC and BCH Enterprise.

Despite her being the sitting Director of the Cardiology NP team, her long-standing NP and Operational Leadership roles within the Heart Center and the BCH enterprise, and consistently stellar Performance Evaluations as Nurse Director, Nurse Manager and practicing NP, BCH refused Ms. Saia's request for job code conversion even though there was precedent to do so. During this process, Ms. Saia was humiliatingly forced to apply for and interview for her existing job under the guise of it being a "new APRN Director job code" even though the duties and responsibilities for this position were the same as her role at the time. Although Ms. Saia was by far the most qualified candidate for the APRN Director role, Ms. Saia was informed that BCH wanted to hire someone "more junior" for the position for a "fresh perspective." Indeed, "more junior" inexperienced candidates were given the APRN director positions across the board, as all ten new Directors were under the age of 45, with several in their 30's. None of the newly hired Directors possessed the two preferred hiring qualifications, prior Pediatric APRN (NP) leadership experience and Leadership experience in a complex, research-intensive, academic clinical setting. Ms. Saia possessed both preferred qualifications. The two other existing Nurse Directors who were also practicing NPs with the two preferred hiring qualifications and NP direct reports converted to the APRN Director job code after a rushed and limited interview process. None of the newly hired APRN Directors had the typical requisite 5-7 years of formal leadership that is typical for BCH Director level positions. Just prior to the interviews, the one sitting APRN Director without any NP direct reports was converted to a new job code as a Senior APRN Director without an internal posting of the new Sr. APRN Director

3

position and without a formal interview or competitive interview process. This contradicted what Ms. Saia was told about requisite posting and hiring of any new job code. Several months after this hiring decision, a Voluntary Retirement Program (VERP) was announced. Ms. Saia was the only one of the three sitting Nurse Directors with NPs with NP direct reports who was eligible for the VERP.

Devastated by the blatant acts of discrimination, Ms. Saia brought a charge of discrimination and retaliation against BCH with the EEOC. As a result, BCH continues to retaliate against Ms. Saia by publishing a negative performance review for the first time in her career, excluding her from key Heart Center Operational meetings, obstructing her clinical NP practice, and creating an overall hostile work environment. Ms. Saia brings claims of age discrimination, retaliation, and breach of the covenant of good faith and fair dealing.

## PARTIES

1.      The Plaintiff, Theresa Saia is a 68-year-old Andover resident.

2.      Defendant Boston Children's Hospital ("BCH") is a private hospital with a principal location at 300 Longwood Avenue, Boston, Massachusetts.

## FACTS

3.      Ms. Saia was hired by BCH as a staff nurse on November 23, 1981.

4.      From 1981 to 1995, Ms. Saia held a number of titles at BCH including inpatient staff nurse I, II and III, providing care routinely at the bedside in the Cardiac Intensive Care Unit (CICU). She also held additional leadership roles as Nurse Educator and Charge Nurse in the CICU.

4

5.      In 1995 Ms. Saia transferred to an outpatient staff nurse III position in the Cardiac Clinic where she supported the initial launch of a Same-Day Pre-Admission Program for Cardiac Catheterization and Cardiac Surgical cases. This successful launch matured into a Nurse Practitioner staffing model as of approximately 2003 under Ms. Saia's co-leadership.

6.      Ms. Saia was the first Nurse Practitioner to practice in the NP role in the Heart Center Same Day Pre-Admission Program where she collaboratively led programmatic expansion from 2003-2015.

7.      From 1998 to 2015 Ms. Saia worked as a Nurse Practitioner in the Heart Center Preadmission Program and in Cardiology in collaborative practice with two senior Cardiologists. She also saw patients independently, as one of the first 2 NPs to hold autonomous NP clinic sessions to improve access to care for HC patients starting in 2009.

8.      In the fall of 2015 Ms. Saia accepted a promotion to Nurse Manager with the responsibility of managing the Cardiology and Heart Center Pre-Admission Nurse Practitioner team of approximately 15 NPs in addition to retaining her clinical care responsibilities as an NP.

9.      One month after accepting the Nurse Manager position, Ms. Saia's Nurse Director left her position and, as a result, Ms. Saia was asked by her Associate Chief Nurse (ACNO) to assume a large portion of her prior supervisor's operational leadership duties for the Cardiology Department. Ms. Saia agreed to assume the additional responsibilities in addition to leading and managing the NP team and remaining in clinical practice. The Nurse Manager job code was exempt FLSA status, and Ms. Saia's responsibilities differed from all other Nurse Managers who did not provide direct patient care as a nurse practitioner.

5

10.     Over the course of several years, Ms. Saia engaged in many conversations with her direct supervisor, the Heart Center ACNO, and human resources concerning the fact that Ms. Saia's job code as Nurse Manager did not capture her direct care Nurse Practitioner responsibilities. Unlike all other direct care Nurse Practitioners at BCH, Ms. Saia was not eligible for overtime or bonus based on FLSA status of the Nuese Manager job code. From 2015-2020, Ms. Saia worked an average of 50-55 hours per week in the Nurse Manager role without eligibility for overtime or bonus.

11.     From late 2015 to October of 2020 Ms. Saia's role and responsibilities increased in terms of number of RN and NP direct reports and new operational responsibilities associated with Cardiology department expansion that included rising patient volume, the addition of new programs and additional satellite locations.

12.     Ms. Saia received a promotion to Nurse Director in the fall of 2020 and continued to maintain her operational leadership responsibilities as well as clinical care practice as a Nurse Practitioner. Ms. Saia's performance in all roles (Nurse Practitioner, Nurse Manager/NP, and Nurse Director/NP) was ranked consistently as top or leading from 1998 to 2023.

13.     From 2020-2023, Ms. Saia continued to work collaboratively with nursing, administrative and physician leadership colleagues and many multidisciplinary teams during a period of great change including the 3-year Covid Pandemic, a year-long operational planning committee focused upon moving the Cardiology Department and Heart Center Pre-Admission clinic into the new Hale Building, a several month working group for a space merger in Hale with another department one year after Hale occupation, complex transition planning for the largest number of MD departures and retirements in department history, satellite session

6

additions, moves and expansions, and a preparing and launching the new EPIC EMR System. In addition, Ms. Saia maintained ongoing responsibility as Nurse Administrator on Call, taking call for 24 x 7, 4-5 weeks per week, covering Enterprise-wide issues on off hours in collaboration with Emergency Management and other multidisciplinary leadership colleagues.

14.     In 2021, an APRN Director job code was created to provide oversight of professional and administrative APRN practice across the enterprise, and to work collaboratively with clinical and administrative leaders to grow and develop APRN practices at BCH. This position had no direct reports and the position was administrative and clinical in scope.

15. In the spring of 2023, BCH leadership announced plans to add additional APRN Director positions with the goal being that every Nurse Practitioner reported to an NP Director. This was exactly the position that Ms. Saia held at this time in the Outpatient Cardiology and HC Preadmission area, with 45 NP Direct Reports. She was in the job code of Nurse Director as there was not a separate job code for NPs who were in the Director job code with NP direct reports and practicing clinically as an NP. BCH Nurse Directors typically possess a Master's Degree but the majority are not licensed, certified, and credentialed as NPs as well. Ms. Saia has a Master's Degree in Nursing as a Pediatric Nurse Practitioner and a Doctor of Nursing Practice (DNP) degree. She is a certified Nursing Executive as well.

16.     When the additional positions were announced, Ms. Saia was delighted at the possibility of finally being able to be in a job code that recognized both her clinical practice and operational leadership qualities. However, Ms. Saia was informed that she would need to interview to be placed in the "new job code" vs converting her job code to reflect her current responsibilities that included clinical practice as an NP and Director of NPs in her area.

7

17.    Ms. Saia was informed by BCH that it was "not possible" for her to move into the job code, with or without expanded scope, even though this was common at BCH and had even been done with Ms. Saia before. The conversion of job codes and reports to relationships are common at BCH; a requisite interview and job posting prior to those changes is not standard practice.

18.    At the time the new job codes were announced, there was one NP staff member in the APRN Director job code who had no NP direct reports. This staff member was charged with overseeing the hiring process for the additional APRN Director positions that were posted in Mid-October 2023. Just prior to the new job codes being posted this individual's job code was changed to Senior APRN Director so that she could assume the APRN Directors as Direct Reports. Notably, this individual did not have to interview for the position, and the position was never posted. This conduct completely contradicted what was told to Ms. Saia about the requisite posting and competitive interview process for the "new job code/new position."

19.    After being told that she had no other choice, Ms. Saia applied for the "new job code" of APRN Director with the assurance that the most qualified person would assume the new job code.

20.    After Ms. Saia submitted her application there were several delays in scheduling her interviews. BCH Human Resources "lost" her information, and she had to re-send her application to a contract recruiter so that her interviews would be scheduled within the noticeably brief period allotted for the interview process.

21.    Notably, throughout this hiring process, there were breaches in typical BCH hiring practices including younger candidates preferentially receiving coaching and interview

questions from the Senior APRN Director and MDs in leadership positions. Interview feedback that is typically sent to HR may not have been received by HR nor considered in the final decision-making process.

22.    Guidance was provided to NP interviewers to send feedback and rankings to one MD vs to Human Resources, as is typical. When the NP interviewers asked for a meeting to address their concerns regarding these hiring process breaches, the request was denied without discussion or explanation.

23.    A meeting to discuss the interview process and rank candidates, with all interviewers, was cancelled on short notice without explanation. No internal reference was sought for the HC APRN Director – an internal reference is a requisite step in the BCH hiring process for all existing hospital employees seeking new roles, prior to offer extension.

24.    In October of 2023 Ms. Saia was interviewed by several of her own direct reports as well as several nursing and MD leaders in the Heart Center.

25.    At least one key interviewer did not meet Ms. Saia.

26.    The interviews that did occur went well for Ms. Saia based upon the positive feedback that she received from nurse leaders, NP's, and several MDs, with one NP remarking that the interview was like "listening to a Master Class."

27.    At the time of the interviews, Ms. Saia was the Director of 45 Ambulatory Cardiology NPs, 50% of the NPs within the Heart Center.

28.    There were five other applicants for the Heart Center APRN Director Role. None of them had the prior operational leadership that Ms. Saia had.

9

29.     None of the other applicants had experience with regulatory oversight, budget responsibilities, research/QI leadership, or hiring and HR processes.

30.     Ms. Saia was the only candidate who had the two preferred qualifications - NP leadership experience and operational leadership experience in an Academic Hospital setting, and she was the only candidate that was Doctoral prepared.

31.     Ms. Saia had been the Co-Chair of the Nurse Practitioner Council for 8 years and she was a co-author and a working group leader responsible for the creation and implementation of the Professional Advancement Model for all Nurse Practitioners at BCH. She had secured Strategic Investment Funding for the implementation of the Heart Center Nurse Practitioner Fellowship designed to train novice NPs for clinical practice and had overseen 6 cohorts of NP fellows with a ~ 75% retention rate. This NP fellowship was subsequently scaled across the enterprise.

32.     Despite Ms. Saia's qualifications and stellar track record, the Heart Center APRN Director position was offered to a younger, inexperienced candidate.

33.     The hiring manager informed Ms. Saia that "you are highly qualified, highly accomplished, and highly valued as a leader in the Heart Center and at BCH. You were highly ranked in the interview process and there was awareness that you could do this job as well as you are doing it already. That said, the new position was offered to another candidate as the Physician Leaders had a preference to go in a different direction with a more junior applicant for a fresh perspective."

34.    Every new APRN Director hired, who was not in a Nurse Director role prior, was under 45 years old, with some new hires being in their 30's, suggesting that age was the major factor in the decision-making process.

35.    All ten of the newly hired APRN Directors were more than twenty years younger than Ms. Saia.

36.    Not being in this job code has eliminated Ms. Saia's ability to qualify for overtime or seasonal incentive plans with bonus as the new APRN Director roles are FLSA Exempt-plus and her Nurse Director job code is FLSA Exempt. Furthermore, this move has removed Ms. Saia's career path. She will not be able to rise to Senior APRN Director if additional Senior APRN Director positions are created in the future, and it has been extremely difficult and now near impossible for her to practice as an NP in clinical sessions, as the scheduling decisions no longer fall under her NP sessions.

37.    Subsequent to the APRN Director decision, all NP's have received three market adjustments that Ms. Saia has been told that she cannot receive despite her clinical work as an NP. The salary ranges for APRNs are now higher than RNs and Nurse Directors.

38.    Ms. Saia's current job code as Nurse Director vs APRN Director does not allow for compensation increases with professional-level advancement.

39.    Prior to the implementation of the first APRN Director position in 2022, advancement of an NP/Nurse Director from Level 1 to Level 2 and Level 3 was deemed not possible due to the Nurse Director job code.

11

40.     With the inception of the new APRN Director positions, NPs in Lead NP or APRN Director positions can receive designation of clinical advancement and the compensation associated with advancement on the professional advancement model that Ms. Saia co-authored with her ACNO, Chief Nursing Officer and other NP leaders across the enterprise over a 3 year period.

41.     Ms. Saia received level 2 APN designation as of August 2024 and Level 3 APN Designation as of September 2025, but BCH denied her requests for compensation increase commensurate with level advancement based on her Nurse Director vs APRN Director job code. She is also not eligible for preceptor pay if she precepts NPs.

42.     Just nine months after BCH's decision to go in a "more junior" direction for a "fresh perspective" with its hiring of younger, inexperienced APRN Directors, BCH rolled out a voluntary early retirement program (VERP) to Ms. Saia and other similarly situated employees.

43.     Ms. Saia had no plan to retire and planned to work into her 70s based on her family's financial goals and love of her work. BCH has repeatedly encouraged Ms. Saia to retire since she filed an EEOC claim, even though the VERP was "voluntary."

44.     Ms. Saia brought a formal charge of discrimination and retaliation against BCH with the Equal Employment Opportunity Commission in September 2024 only after exhausting all possible internal BCH pathways for the resolution she was seeking, that being reinstatement to APRN Director of the Ambulatory Cardiology NP team via job code conversion with an updated salary assessment and the ability to see patients as she had done historically.

45.     In the EEOC proceeding, BCH denied age discrimination and has taken the position that Ms. Saia was passed over for the APRN Director position due to her "track record

12

of not being a strong collaborator" and cited to the allegation that Ms. Saia once promoted two new Lead NP's without consulting key stakeholders, specifically the physicians.

46.    BCH's allegations were baseless and clearly pretextual: at the time of the Lead NP advancement in August 2023, Ms. Saia reported to a Sr. Nurse Director and ACNO and the physicians were not directly involved in the approval process for NP advancements. The approval to move forward was granted by Ms. Saia's ACNO after her ACNO conveyed to Ms. Saia that CNO approval was in place. Ms. Saia cannot approve a promotion without ACNO, CNO, Human Resource Business Partner and Compensation approval. Ms. Saia followed the guidance provided by her Senior Director and ACNO, respecting and following the existing chain of command for her position within the Heart Center and BCH Organizational Charts at that time. Although the NPs reported directly up through Nursing Leadership, decisions made regarding NP assignments were always made collaboratively with her MD colleagues.

47.    44 years of overwhelmingly positive annual reviews from BCH contradict their assertions about Ms. Saia's collaboration abilities:

- "Terry has led an extraordinary team over the past year in ambulatory cardiology…There have been a number of challenges that have required collaborative leadership and effective communication." (2021 Performance Review).
- "Terry is an amazing mentor to many APPs and peers. She is approachable and an extremely good listener. I would not hesitate to go to Terry with any concern or challenge to work through or receive feedback. She provides a safe environment for discussion and coaching. I truly cannot say enough positive things about Terry. She is well respected by her peers and all disciplines." (2024 Performance Review)

13

- "Terry is viewed as strong, respectful, and well-liked leader across the heart center and beyond. Terry is reliable and dedicated." (2024 Performance Review)

- "Terry was able to collaborate and lead operational and patient care decisions. She was able to guide and support teams through changes and then evaluate and reevaluate processes. (2020 performance review).

48.    There is not a single negative comment about Ms. Saia's collaboration skills in her 500+ page personnel file with BCH.

49.    Meanwhile, Ms. Saia's CV notes the collaborative leadership roles she has fulfilled over the past several decades. In fact, when she heard of the implementation of the additional APRN positions, she volunteered to join a working group with the APRN Director and other Nurse Directors to help define the distinct responsibilities of the Nurse Director and APRN Director roles to position the new leaders for success by minimizing the potential for role confusion or conflict. When new Medical Directors were added to her setting, she supported her physician colleagues in their new roles by creating operations meetings to establish a forum for communication and collaborative planning, offering thoughtful input and NP and RN support for new initiatives suggested by the MD Directors. She also collaborated with the sitting APRN director, her SVP supervisor, the Medical Director of a subspecialty program, and the Outpatient Cardiology Chief to support the first APRN Director's transition from predominantly clinical care to more administrative time and endorsed and enthusiastically supported the implementation of the initial Lead NP role in Cardiology as suggested by the initial APRN Director.  At that time, Ms. Saia was told that the Lead NPs would remain her direct reports. In retrospect, that comment was not truthful.

14

50.      Ms. Saia declined to participate in BCH's early retirement offer despite BCH's efforts to shame her into accepting it. During the EEOC proceeding, BCH's in-house counsel remarked that by choosing not to accept the VERP Ms. Saia "must not be good with money" and that "BCH should not be expected to make Ms. Saia CEO."

51.      Being CEO was never a resolution that Ms. Saia sought; she has only sought reinstatement as NP Director for the Ambulatory Cardiology NP team, conversion of her job code and an updated salary assessment. BCH Counsel also stated that Ms. Saia "should accept the VERP and go get another job as all the Boston Hospitals are desperate for NPs." This lacks awareness and respect of the expertise and decades of experience Ms. Saia possesses in the care of children and adults with congenital and acquired heart disease. She spent her entire career in this field and BCH is the only setting in Boston caring for this complex population.

52.      These comments and the behavior of BCH during and subsequent to this hiring process are contradictory to the BCH Values of Respect, Teamwork, Inclusivity and Kindness and the Commitment to Equity, Diversity and Inclusion as well as several BCH Policies including (1) Policy Against Discrimination, Discriminatory Harassment and Retaliation Policy/Procedure (2) Standards of Conduct (3) Professional Behavior Policy/Procedure and (4) Compensation Policy/Procedure.

53.      After initially telling Ms. Saia that they were going in a "more junior" direction for a "fresh perspective," BCH has attempted to gaslight Ms. Saia to portray her as an unqualified candidate with a less than stellar work history.

54.      The allegations of being uncollaborative are pretextual. The allegation of not being forward-thinking or open to change is also pretextual as evidenced by Ms. Saia's CV and

15

the major operational changes she has experienced and help support over the past 4 decades, all which involved collaboration with physicians. The published literature notes that terms such as "fresh perspective, not open to change, going in a different direction and seeking a more junior candidate" reflects age discrimination.

55.    Subsequent to her filing of the EEOC complaint, Ms. Saia has experienced several instances of retaliation at the workplace.

56.    After telling Ms. Saia that they were going to in a "more junior" direction for a fresh perspective, BCH continues to gaslight Ms. Saia in an effort to portray her as an unqualified candidate with a less than stellar work history.

57.     As a result of BCH's discriminatory and retaliatory conduct, Ms. Saia has suffered from emotional distress, stress, and anxiety in addition to the negative fiscal impact.

**COUNT I – Age Discrimination Mass. Gen. Laws ch. 151B**

58.    The Plaintiff re-states the allegations set forth in Paragraphs 1 through 57 as if fully set forth herein.

59.    Ms. Saia is 68 years old and is in a protected class based on her age.

60.    Ms. Saia was the most qualified candidate for the APRN Director job as evidenced by her experience, work history, and performance reviews.

61.    BCH awarded the APRN Director job to a younger and less qualified applicant, stating that despite Ms. Saia's stellar interview process that BCH wanted a "more junior" candidate for the job.

62.    As a result of BCH's actions, Ms. Saia has suffered lost wages, humiliation, and emotional distress.

16

**COUNT II – Age Discrimination in Employment Act of 1967**

63.    The Plaintiff re-states the allegations set forth in Paragraphs 1 through 40 as if fully set forth herein.

64.    BCH's actions are in violation of 29 U.S.C. sec. 621-634, the Age Discrimination in Employment Act of 1967.

65.    As a result of BCH's discriminatory conduct, the Plaintiff has suffered damages.

**COUNT III – Retaliation (G.L. c 151B and Age Discrimination in Employment Act)**

66.    The Plaintiff re-states the allegations set forth in Paragraphs 1 through 43 as if fully set forth herein.

67.    As a direct result of Plaintiff's good faith EEOC discrimination charge, BCH has retaliated against the Plaintiff by, among other things, giving the Plaintiff a negative performance review, failing to perform requested comp assessments, excluding the Plaintiff from key HC operational meetings, obstructing her NP clinical practice, denying her participation in ongoing leadership development training that all Nurse and NP leaders have received despite her request for inclusion, and creating an overall hostile work environment for the Plaintiff where she is unable to act as a Sr. Advisor for Cardiovascular, Critical Care and Perioperative Programs, as promised as a way to resolve an internal grievance filed in December 2023.

68.    As a result of BCH's actions, Ms. Saia has suffered damages, including but not limited to humiliation and emotional distress.

**COUNT IV – Breach of Implied Covenant of Good Faith and Fair Dealing**

69.    The Plaintiff re-states the allegations set forth in Paragraphs 1 through 68 as if fully set forth herein.

70.     As an employee with over 44 years of service to BCH, BCH owed to Ms. Saia a duty of good faith and fair dealing.

71.     BCH violated its covenant of good daith and fair dealing by, among other things, engaging in discriminatory conduct throughout the APRN Director selection process and then subsequently retaliating against Ms. Saia after she made a good faith charge with the EEOC.

72.     As a result of BCH's actions, Ms. Saia has suffered lost wages, humiliation, and emotional distress.

WHEREFORE, the Plaintiff, Theresa Saia hereby requests that this Court enter judgment in her favor on all counts and award the following relief:

a. Damages for lost wages and benefits;

b. Damages for emotional distress and humiliation;

c. Punitive damages;

d. Interest on all damages; and

e. Reasonable attorney's fees and costs associated with prosecuting this matter.

PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE

Respectfully submitted,
THERESA SAIA,
By her attorneys,

*/s/ Daniel J. Murphy, Jr.*

_____

Daniel J. Murphy, BBO No. 549073
Daniel J. Murphy, Jr. BBO No. 685760
THE MURPHY LAW GROUP, LLC
565 Turnpike Street, Suite 72A
North Andover, MA 01845
Tel: (978) 686-3200
Fax: (978) 686-3883

DATED:        February 27, 2026

19

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Massachusetts Trial Court<br>Superior Court |
|---|---|---|
| | | COUNTY |

| Plaintiff | THERESA SAIA | Defendant: | BOSTON CHILDRENS HOSPITAL |
|---|---|---|---|
| ADDRESS: | Andover, MA | ADDRESS: | 300 LONGWOOD AVE |
| | | | BOSTON MA 02115 |

| Plaintiff Attorney: | Daniel J Murphy Jr. | Defendant Attorney: | |
|---|---|---|---|
| ADDRESS: | The Murphy Law Group LLC | ADDRESS: | |
| 565 Turnpike Street, Suite 72A | | | |
| North Andover, MA 01845 | | | |
| BBO: | 685760 | BBO: | |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination and Retaliation | F | ☒ YES    ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?          ☐ YES    ☒ NO

Is there a class action under Mass. R. Civ. P. 23?          ☐ YES    ☒ NO

### STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date

    1. Total hospital expenses

    2. Total doctor expenses

    3. Total chiropractic expenses

    4. Total physical therapy expenses

    5. Total other expenses (describe below)

        Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date          $350,000.00

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses

E. Reasonably anticipated lost wages          $2,000,000.00

F. Other documented items of damages (describe below)          $1,000,000.00

Emotional Distress.

        TOTAL (A-F): $3,350,000.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Signature of Attorney/Self-Represented Plaintiff: X _____    Date: 2-27-26

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION UNDER S.J.C. RULE 1:18(5)

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X _____    Date: 2-27-26

SC0001: 02/24          www.mass.gov/courts          Date/Time Printed:02-27-2026 15:15:44